UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA,                      09 Cr. 339

      -v.-

                                   OPINION

ANTONIO GUERRERO, et al.,

           Defendants

------------------------------------

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/14/10
```

A P P E A R A N C E S:

          <u>Attorneys for Government</u>

          PREET BHARARA
          United States Attorney for the
              Southern District of New York
          86 Chambers Street, 3rd Floor
          New York, NY  10007
          By:  Laurie Korenbaum, Esq.
              Marissa Molé, Esq.
              Aimee Hector, Esq.

          <u>Attorneys for Defendants</u>

          KELLEY DRYE & WARREN, LLP
          101 Park Avenue
          New York, NY  10178
          By:  Don Buchwald, Esq.

          FREDERICK H. COHN, ESQ.
          61 Broadway, Suite 1601
          New York, NY 10006

          DAVID S GREENFIELD, ESQ.
          100 Lafayette Street, Suite 502
          New York, NY 10013

**Sweet, D.J.**

Defendant Antonio Guerrero ("Guerrero"), moved in limine to preclude the Government from calling as a trial witness Gloria A. Garrido ("Ms. Garrido"), the mother of one of the victims in this case, and to admit into evidence the perjured testimony of two alibi witnesses in a related state trial.  Defendant Edwin Maldonado ("Maldonado") has moved in limine to admit into evidence Ruben Negron's eye witness testimony in the same state trial.  The Government has moved in limine (1) to admit certain evidence of charged and uncharged crimes committed by Defendants, (2) to admit certain prison records related to Defendants, and (3) for a protective order regarding the dissemination of material produced pursuant to 18 U.S.C. § 3500 ("3500 material").  For the reasons set forth below, Guerrero's motion to admit the alibi witness testimony is denied and his motion to preclude Ms. Garrido's testimony is granted. The Government's motion to admit evidence of charged and uncharged crimes is granted in part and denied in part; its motion to admit prison records is premature on the record presently before the Court; and its motion for a protective order is granted.  Decision is reserved on Maldonado's in limine motion, as well as on the Government's in limine

1

motions to admit evidence of uncharged crimes as outlined in its April 6 letter to defense counsel, as it is understood that the Defense may submit further responses to these motions after receiving the 3500 material.

## I.    PRIOR PROCEEDINGS

On April 7, 2009, a federal grand jury in the Southern District of New York returned and filed Indictment No. 09 Cr. 339 (RWS) against Guerrero, Maldonado, Omar Flores ("Flores"), and Johnny Cedeno[1] (the "Indictment"). The Indictment charged the Defendants, while engaged in a drug conspiracy as members of the Solid Gold drug crew in the Bronx, with participation in three separate shootings that resulted in the death of four individuals in late 1994.  Guerrero is charged with the murders of Fernando Garrido and Livino Ortega ("Ortega").  Flores and Maldonado are charged with the murders of Leonard Overman ("Overman") and Carmen Diaz ("Diaz").

These motions were heard and marked fully submitted on April 7, 2010.

---

[1] Johnny Cedeno has not yet been arrested on these charges.

2

## II.   DISCUSSION

### a. <u>Deborah Gonzalez and Valerie Martinez's Testimony in Leonardo Flores's State Trial Is Inadmissible as Irrelevant</u>

Guerrero is charged with two murders which occurred on September 3, 1994.   Leonardo Flores, a/k/a "Roberto Mercado" was tried and convicted of being responsible for the same murders in 1996, but his conviction was vacated twelve years later when purported eye witnesses recanted their testimony.   He then pleaded guilty to being the getaway car driver rather than the shooter in the two murders.   At his trial in 1996, Deborah Gonzalez, his girlfriend at the time, and Valerie Martinez, an acquaintance, testified that they had been at the movies with Leonardo Flores on the night of the shooting.   By Leonardo Flores's eventual guilty plea, these witnesses were later shown to have perjured themselves.

Guerrero seeks to admit the testimony of these two witnesses "to demonstrate [Leonardo Flores]'s capability and proclivity to construct a detailed and internally coherent lie" to permit argument that his testimony in this trial is unreliable.   However, the

3

evidence is missing a causal link between the perjured
testimony of two witnesses and any propensity of Leonardo
Flores towards dishonesty.  The perjured testimony alone
does not establish Leonardo Flores's propensity to develop
a false alibi or to instruct the witnesses to perjure
themselves at trial.  The testimony of Deborah Gonzalez and
Valerie Martinez from Leonardo Flores's state trial is
inadmissible as irrelevant to the credibility of Leonardo
Flores at this time.  The issue may be revisited depending
upon the substance of his direct testimony.

### b. **Ms. Garrido Is Precluded from Testifying**

Ms. Garrido is the mother of Fernando Garrido,
one of the people with whose murder Guerrero is charged,
and of whose murder Leonardo Flores was initially
convicted.  During the initial investigation of her son's
killing, and the trial of Leonardo Flores, Ms. Garrido was
not contacted by any police department or prosecutorial
authority.  Dowd Aff. ¶ 3.  Earlier this year, Ms. Garrido
was visited by a federal agent believed to be Special Agent
Charles Mulham, id. ¶ 4, who told her that her son's murder
had been under investigation for ten years and that
Guerrero had been arrested in connection with it.  Id.  The

4

agent asked Ms. Garrido if she would be available to the
prosecution if needed and she advised that she would be.
Id. ¶ 5. As of March 10, no subpoena had been served on
her. Id.


Guerrero has moved to preclude the Government
from calling Ms. Garrido as a witness on the grounds that
she has no probative testimony to offer and will only be
used to encourage from the jury enmity against Guerrero.
See Fed. R. Evid. 403 ("[E]vidence may be excluded if its
probative value is substantially outweighed by the danger
of unfair prejudice."). The Government has countered that
Ms. Garrido is the only witness who can identify her son,
and that it "does not intend to put [her] on the stand to
make the jury weep."[2] Gov't Opp'n at 24. At oral argument
on these motions, Guerrero agreed to stipulate to the
admissibility of the proposed photograph of Fernando
Garrido and that it is a photograph of the victim. This
stipulation will obviate the need to identify the
photograph and the probative value of Mrs. Garrido's
testimony is outweighed by possible prejudice.

---

[2] The Government indicates that it intends to call "the mothers or
relatives of the other three murder victims[] to identify photographs
of the murder victims." Gov't Opp'n at 23. Because Guerrero has only
moved to exclude only Ms. Garrido's testimony, the admissibility the
other mother's testimony is not discussed here. The admissibility of
such testimony will be dealt with when it is raised directly.

5

### c. **Certain Evidence of Charged and Uncharged Crimes Committed by Defendants is Admissible; Certain of the Evidence is Inadmissible**

At trial, the Government intends to introduce evidence of (1) other charged and uncharged crimes committed by Defendants; (2) drug dealing Defendants after the commission of the charged murders with other members of the Solid Gold drug crew or at Solid Gold's drug spot on Boston Road and 173rd Street; and (3) with respect to Defendant Flores, evidence of his drug dealing with cooperating witnesses ("CWs") at a spot on the Lower East Side of Manhattan from approximately 1997 to 1998. The Government argues that the evidence, described below, is admissible because it constitutes direct substantive proof of the charges in the Indictment; demonstrates the nature, existence, and background of the narcotics conspiracy that is an element of the murder counts charged pursuant to 21 U.S.C. § 848(e) and 18 U.S.C. § 924(j); is evidence of a prior and subsequent course of dealing between Defendants and their alleged co-conspirators, as well as others; demonstrates the relationship of trust that existed between among and between Defendants and their alleged co-conspirators and co-participants in the murders; and/or is

6

background to, part of, and inextricably intertwined with
Defendants' alleged participation in the charged murders.
In the alternative, Government argues that some of the
evidence is admissible pursuant to Rule 404(b) of the
Federal Rules of Evidence because it demonstrates
Defendants' knowledge, intent, motive, opportunity,
identity, and lack of mistake or accident with respect to
the charged murder counts in the Indictment, and because
much of the evidence constitutes material that the
Government is entitled to reveal under Giglio v. United
States, 405 U.S. 150 (1972), which requires the prosecution
to disclose information tending to impeach the character or
testimony of their witnesses.

　　　　　The evidence which the Government has moved in
limine to be ruled admissible is laid out below and the
admissibility of each piece of evidence is addressed
separately.

### i. **Two Carjackings, To be Offered Against Maldonado, Are Inadmissible**

　　　　　The Government expects that a CW will testify
that he/she committed two carjackings with Maldonado in or
about 1990-91.  The Government plans to indicate that

7

Maldonado and the CW used "guns and pellet guns" to commit these carjackings.  The Government argues that these crimes, which occurred shortly before the formation of Solid Gold demonstrate a relationship of trust between the CW and Maldonado, demonstrate that Maldonado had access to firearms, and help to explain why the CW would recruit Maldonado to commit two of the charged homicides.  The CW will also testify to these carjackings as part of the CW's Giglio evidence.

Given that these crimes occurred at least three years before the charged murders, the use of guns on that occasion does not establish opportunity under 404(b).

The Government may fulfill their obligation under Giglio by eliciting the CW's participation in these carjackings without implicating Maldonado.

> ii. **Shooting in the Fall of 1992 At Boston Road Drug Spot, To Be Offered Against Guerrero, Is Admissible**

The Government expects that two CWs will testify that in approximately the Fall of 1992, an African American drug dealer robbed Jimmy Feliz ("Feliz"), an associate of Solid Gold, at the Boston Road spot.  Subsequently one CW

and Guerrero told Guerrero's drug associates from the
Castle Hill section of the Bronx about the robbery. Those
men later returned to the Boston Road spot and began
shooting at the African American drug dealer.

The Government argues that this incident is proof
of the existence of the Solid Gold Narcotics conspiracy and
Guerrero's participation in that conspiracy; demonstrates
the relationship of trust between the CW and Guerrero, and
corroborates testimony by other witnesses about the efforts
of Solid Gold to maintain exclusive control over their drug
territory, which was the motive for the murders charged in
the Indictment. The testimony is evidence of the
conspiracy and its purposes and is admissible.

### iii. Shooting in the Winter of 1992/1993 at Boston Road Drug Spot, To Be Offered Against Guerrero, Is Admissible

The Government expects that CWs will testify that
in approximately the Winter of 1992/1993, a CW and Guerrero
shot at a Dominican drug dealer who was selling crack
cocaine at the Boston Road drug spot without authorization
from Solid Gold or the previous owner of the spot, Feliz.
The shooting took place at 173rd Street and Boston Road.

9

The Government argues that this incident is direct proof of the existence of Solid Gold narcotics conspiracy and Guerrero's participation in that conspiracy, demonstrates the relationship of trust between the CW and Guerrero, and corroborates testimony by numerous other witnesses about the efforts of Solid Gold to maintain exclusive control over their drug territory which was the motive for the murders charged in the Indictment. Moreover on CW will testify to this incident as part of the CW's Giglio.

The testimony is background evidence of the conspiracy and Guerrero's participation in it and is admissible.

### iv. **Robberies of Crack Addicts, To Be Offered Against Guerrero, Are Admissible**

The Government expects that one CW will testify that some time prior to the arrest of Feliz on April 24, 1993, the CW and Guerrero robbed three or four customers of Feliz who were purchasing crack cocaine at the Boston Road spot. The CW will further testify that the CW and Guerrero

10

ceased committing the robberies on the order of Feliz, who felt the robberies would drive customers from the spot.

The Government argues that these robbery incidents demonstrate the relationship of trust between the CW and Guerrero leading up to the murders of Ortega and Fernando Garrido and that the CW will testify to this incident as part of the CW's Giglio obligation. However, the CW can testify as to his involvement with the robberies without implicating Guerrero. The incident is probative of the existence of the conspiracy and its purposes. It is admissible.

### v. September 8, 1993 Arrest of Guerrero, To Be Offered Against Guerrero, Is Inadmissible

The Government expects that multiple CWs will testify that Guerrero and another member of Solid Gold, known as "K-Solo," beat an off-duty traffic officer with guns. The incident took place in front of 1683 Boston Road, where Guerrero lived at the time and where Solid Gold is alleged to have stored its guns and drugs in Guerrero's apartment in that building. After a confrontation with the police officer, Guerrero and K-Solo went to Guerrero's apartment where both of them retrieved guns. The two of

11

them then confronted the officer and beat the officer with the guns. Guerrero was later arrested for this crime. Guerrero admitted beating the officer, but claimed he used a pipe. The Government will also present testimony from the officer who was beaten, and the officer who arrested Guerrero and took a statement from him.

The Government seeks to admit the evidence as relevant to corroborate the testimony of numerous witnesses that Solid Gold stashed its firearms in Guerrero's apartment, and that those firearms were available, as needed, to members of Solid Gold. Although Guerrero has admitted beating the police officer, he has consistently contested that he used a gun. There is no representation that the arresting officer or the victim will testify to having seen a gun or that it was obtained from Guerrero's apartment.

The incident appears unrelated to the conspiracy, and the prejudice outweighs its probative value. It is inadmissible.

> **vi. November 20, 1993 Arrest of Guerrero, To Be Offered Against Guerrero and Flores, Is Inadmissible**

12

The Government expects that multiple CWs will testify that in the Fall of 1993, a CW and another person accidentally hit another car in the Bronx. The CW and the other person were badly beaten by the occupants of the car. The CW and the other person abandoned their car at the location and returned to 173rd Street and Boston Road where the CW gathered members of the Solid Gold crew, including Guerrero and Flores, and returned to the scene of the accident to retaliate. When they arrived, the police were on the scene and Guerrero was arrested when he tried to drive away in the car that the CW had left there. The Government will also present testimony from the arresting officer which confirms the testimony of the CW about this event.

The Government submits that this incident will demonstrate the relationship of trust between the CW, Flores, and Guerrero leading up to the charged murders.

The incident and the arrest appear to be unrelated to the conspiracy and therefore irrelevant and inadmissible.

13

### vii. Guerrero's Possession of a Gun in Early January 1994, To Be Offered Against Guerrero and Flores, Is Admissible

The Government expects that a CW will testify that shortly before the murder of Feliz, discussed immediately below, Guerrero told the CW that he and Flores had been smoking marijuana on a rooftop on 173rd Street and Boston Road when Feliz approached them and asked them what they were doing there.  The encounter was significant to Guerrero and Flores because they knew at the time that Solid Gold was plotting to kill Feliz and they were concerned that Feliz knew of the plot and could be planning to kill members of Solid Gold first, before he could be killed.  As a result of his apprehension over Feliz, Guerrero told a CW that he had been armed with a gun the day that Feliz confronted them on the rooftop.

The Government argues that this event demonstrates that Guerrero had access to guns, generally corroborates the CWs with respect to the origins of the drug wars on Boston Road that led up to the charged homicides, and thereby provides background and context to the charged homicides.

14

The incident is evidence of the background to the
conspiracy and its origination and is admissible.

### viii. **Events Surrounding the January 11, 1994 Murder of Feliz, To Be Offered Against Guerrero and Flores, Is Admissible**

The Government expects that multiple CWs will
testify about the murder of Feliz who owned the Solid Gold
drug spot prior to being incarcerated in 1993 on a gun
charge.  When Feliz got out of jail, he made it known that
he wanted the spot back.  As a result, core members of
Solid Gold decided to have Feliz killed.  Guerrero and
Flores, neither of whom participated in the murder of
Feliz, were nonetheless aware of the plot to kill Feliz and
approved of it.  Because they were aware that the murder
was going to occur, both Flores and Guerrero were present
in the immediate vicinity of the homicide and ran from the
scene when shots were fired.  After the murder, Guerrero,
armed with a gun, pretended that he was going to exact
revenge on the persons responsible for Feliz's death in
order to deflect suspicion away from Solid Gold and to
assuage Feliz's brother.  After the murder, members of
Solid Gold, including Guerrero and Flores, attended the
wake for Jimmy Feliz, and Guerrero was armed with a gun

because the crew believed they might be in danger of
retaliation from Feliz's family and associates.

This incident is evidence of the existence of the
Solid Gold narcotics conspiracy and Guerrero's and Flores's
participation in that conspiracy, and provides background
and context to the murders charged in the Indictment, as it
evidence of the purpose of the conspiracy to secure and
maintain their drug territory.  In addition it is evidence
that Guerrero and Flores were members of Solid Gold, who
had full knowledge of a murder that was being plotted by
the crew, and, with respect to Guerrero, who assisted Solid
Gold in its efforts to obscure its role in the murder.  The
incident also is  evidence of motive and intent and is
admissible.

### ix.  The Plot to Shoot Overman in the Winter of 1994, To Be Offered Against Guerrero and Flores, Is Admissible

The Government expects that multiple CWs will
testify that the winter before the murder of Overman, the
Solid Gold crew, including Guerrero and Flores, went to the
roof of 1690 Boston Road in order to shoot Overman.
Guerrero sent a bag of guns, which were stored in his

16

apartment at 1693 Boston Road, to the roof, and the Solid
Gold crew armed themselves in anticipation of the shooting.
Before the shooting could occur, however, Solid Gold
members believed that police were on the block, discarded
the guns, and dispersed.

The Government submits that this incident is
direct proof of the Solid Gold narcotics conspiracy and
Guerrero's and Flores's membership and participation in
that conspiracy, demonstrates that Guerrero stored guns for
the crew and that he and Flores had free access to those
guns, and demonstrates the relationship of trust between
Guerrero and Flores, and with their co-defendants and the
CWs.

Because the incident relates directly to an
earlier opportunity to commit the murder with which Flores
is charged, it is admissible against him as evidence of
opportunity and intent under Rule 404(b). The incident
also demonstrates Guerrero's access to guns and his
membership in the conspiracy. In considering the
determination required under 404(b), the probative value of
Guerrero's participation in the conspiracy outweighs the
prejudice. This incident is admissible.

17

**x.  The Attempt to Shoot Al Wade and Other
Members of Overman's Drug Crew in the Summer
of 1994, To Be Offered Against Guerrero, Is
Admissible**

The Government expects that CWs and possibly
other witnesses will testify that in the Summer of 1994,
CWs and Guerrero agreed to shoot members of Overman's rival
drug crew on 173rd Street and Boston Road.  All three were
armed with guns and waiting for members of Overman's crew
to arrive on the block.  Guerrero left the scene to
urinate.  When members of Overman's crew arrived on the
block, CWs shot at them.

The Government argues that this incident is
direct proof of the existence of the Solid Gold narcotics
conspiracy, the participation of Guerrero in that
conspiracy, demonstrates the relationship of trust between
Guerrero and other members of Solid Gold, including the
CWs, and provides context and background to the impending
murders of Solid Gold's drug rivals, including Overman, as
charged in the Indictment.

18

This incident is evidence of the conspiracy and
its purpose and Guerrero's membership in it.  It is
admissible.

### xi.  Shooting Incident In August 1994, To Be Offered Against Guerrero and Flores, Is Admissible

The Government expects that CWs will testify that
in approximately August of 1994, members of the Solid Gold
crew, including Guerrero, Myron Mercedes, a/k/a "Mike," and
Cedeno, decided to kill a group of African American drug
dealers who were selling crack on 173rd Street and Boston
Road.  Guerrero provided a gun to another member of Solid
Gold who shot at the group of drug dealers.  Later, members
of Solid Gold, including Guerrero, reported the shooting to
other members of Solid Gold who were in the Dominican
Republic, including Flores.

The Government suggests that this incident is
direct proof of the existence of the Solid Gold narcotics
conspiracy, the participation of Guerrero and Flores in
that conspiracy, demonstrates the relationship of trust
between Guerrero, Flores, and other members of Solid Gold,
and provides context and background to the impending

19

murders of Solid Gold's drug rivals, as charged in the
Indictment.

The incident is evidence of the conspiracy, its
purpose and the membership of Guerrero and Flores. It is
admissible.

### xii. September 3, 1994 Attempt to Kill Overman, To Be Offered Against Guerrero, Is Admissible

The Government expects that CWs will testify that
on the day that Fernando Garrido and Ortega were murdered,
the Solid Gold crew, including Guerrero, went to the
vicinity of Hoe Avenue and 173rd Street in the Bronx in
search of Overman, whom they intended to kill. Guerrero
was armed with a gun, leaned out the window of a white van,
and pointed the gun at African American males, whom he
believed to be Overman and his associates. Guerrero did
not fire the gun when he realized that the males were not
Overman and members of his drug crew.

The Government submits that this incident is
direct proof of the existence of the Solid Gold narcotics
conspiracy, the participation of Guerrero in that

conspiracy, the relationship of trust between Guerrero and other members of Solid Gold, and provides context and background to the impending murders of Solid Gold's drug rivals, as charged in the Indictment.

The incident is evidence of the conspiracy, its purpose, and Guerrero's participation.  It is admissible.

### xiii.  Guerrero's Offer to Make a Murder Contract, To Be Offered Against Guerrero, Is Admissible

The Government expects that CWs will testify about an incident that occurred in approximately the Fall of 1994.  "Shorty," one of Solid Gold's drug suppliers, was the victim of an attempted robbery at his drug spot in the vicinity of 158th Street and Amsterdam Avenue.  Shorty contacted one CW in order to contract out the murder of the perpetrator of the attempted robbery.  After the CW's efforts to recruit a shooter for Shorty failed, Guerrero offered to take the contract himself.  The CW, however, believed that the contract was too dangerous and told Guerrero not to do it, fearful that Guerrero would be killed and that the CW would lose a valuable member of Solid Gold.  Later, after the robber had been killed, CWs,

Guerrero and Guerrero's wife, Maryanne, drove past the scene of the murder at 158th Street and Amsterdam Avenue where they saw the white car belonging to the victim and a police car nearby.

The Government submits this incident as proof of the existence of the Solid Gold narcotics conspiracy, the participation of Guerrero in that conspiracy, and demonstrates the relationship of trust between Guerrero and other members of Solid Gold, and in particular, the CW.

The incident is evidence of the conspiracy, its purpose and Guerrero's participation.  It is admissible.

> xiv.  **Guerrero's Assault on a Male After Overman Is Killed, To be Admitted Against Guerrero, Is Inadmissible**

The Government expects that CWs will testify that, shortly after the murder of Leonard Overman, a man approached the Solid Gold drug spot on 173rd Street and Boston Road, loudly yelling that CW's "friend" had been killed.  In response, Guerrero slapped the man in the face in an effort to quiet him and deflect attention from Solid Gold and its involvement in the murder of Overman.

22

The Government submits that the incident is
direct proof of the existence of the Solid Gold narcotics
conspiracy, and the participation of Guerrero in that
conspiracy.

Without reference to Overman or Solid Gold, any
inference of knowledge and participation is not warranted
by this incident.  It is inadmissible.

### xv. Maldonado's Stabbing of a Rival Drug Dealer at the Boston Road Spot, To Be Offered Against Maldonado, Is Admissible

The Government expects that a CW will testify
that, shortly after Maldonado allegedly murdered Overman,
African American drug dealers were selling inferior crack
cocaine at the Boston Road spot without the permission of
Solid Gold.  The CW asked Maldonado to take care of the
situation by frightening the dealers.  In response,
Maldonado stabbed one of the males approximately five or
six times in the stomach, injuring, but not killing the
man.

23

The Government submits this incident is direct proof of the existence of the Solid Gold narcotics conspiracy, the participation of Maldonado in that conspiracy, and demonstrates the relationship of trust between Maldonado and the CW.

Maldonado in opposition concedes participation in a drug conspiracy with Leonardo Flores and others and argues that in view of that concession the evidence is unduly prejudicial. However, the Government may introduce evidence of the conspiracy, its purposes and Maldonado's membership unless at the time of introduction it is determined to be cumulative. It is admissible subject to a subsequent determination.

### xvi. Maldonado's Shooting at a Car in Queens, To Be Offered Against Maldonado and Flores, Is Inadmissible

The Government expects that CWs will testify about an incident that occurred in approximately late 1994 or early 1995. After the car of a CW was stolen outside Riker's Island, members of the Solid Gold crew saw a similar car with parts, including rims, that had been stolen from the CW's car. Members of Solid Gold, including

24

Maldonado and Flores, thereafter located the residence of
the owner of that car, and followed the thief to a location
in Queens, New York. Once there, Maldonado exited the car
he was in, approached the other car, smashed a window with
his elbow, demanded that the occupants get out of the car,
and shot at the car.

The Government submits that this incident
demonstrates the relationship of trust between Maldonado
and other members of Solid Gold, including Flores and the
CWs, which Maldonado's counsel says will be conceded, and
to corroborate that Maldonado had access to a gun shortly
after the Overman and Carmen Diaz ("Diaz") murders.

This incident does not appear to be related to
the purpose of the conspiracy. Its evidentiary value is
outweighed by the prejudice to Maldonado. It is not
admissible.

### xvii. Guerrero's Possession and Use of a Firearm in Approximately Winter 1994/1995, To Be Offered Against Guerrero, Is Inadmissible

The Government expects that CWs will testify that
in or around Winter 1994/1995, on or around the birthday of

25

Guerrero's wife, Maryanne, Guerrero and his wife had an
argument. In response, Guerrero shot a gun multiple times
in his wife's direction, in an attempt to frighten her.
The incident took place in Crotona Park, which is in close
proximity to the Boston Road drug spot.  The gun belonged
to the Solid Gold drug crew, and was kept in various stash
apartments, including in Guerrero's apartment at 1683
Boston Road.

The Government submits that this incident
demonstrates the close relationship of trust between
Guerrero and the CWs and also demonstrates that Guerrero
had ready access to Solid Gold's firearms.

The incident is unrelated to the conspiracy or
the charged crimes and is suggestive of Guerrero's
propensity to violence.  It is inadmissible.

### xviii. **Maldonado's Possession of a Gun on October 1, 1995, To Be Offered Against Maldonado, Is Inadmissible**

The Government expects that multiple CWs will
testify that on October 1, 1995, Maldonado obtained a
firearm from a member of Solid Gold, with the approval of

26

one of the CWs, which the Government alleges was used to murder Raheim Washington, in an incident unrelated to the Solid Gold drug crew.[3]

The Government submits that this incident is evidence of the relationship of trust between Maldonado and other members of Solid Gold, including the CWs, and his easy access to Solid Gold's guns.

The incident, occurring almost a year after the charged murders, appears unrelated to those crimes and the likelihood of prejudice and confusion outweigh any evidentiary value.  The incident is not admissible.

### xix. Guerrero's Threats Against a Co-Conspirator Are Admissible

The Government expects that a CW will testify that in approximately early Winter 2005, CW met with Guerrero on 173rd Street and Boston Road, in the immediate vicinity of a barbershop that is still on that block. During that meeting Guerrero and the CW discussed the fact

---

[3] The Government claims to intend to elicit only facts concerning Maldonado's possession of a Solid Gold firearm, and not his commission of the Raheim Washington murder, unless the defense opens the door to the admission of such evidence.  Obviously, a reference before the jury to this earlier murder in connection with this weapon would be inadmissible as highly prejudicial.

that a co-conspirator in the murders of Fernando Garrido

and Livino Ortega had been federally arrested and released

on bail.  Guerrero suspected that the co-conspirator was

cooperating with the Government and would reveal that

Guerrero had shot Garrido and Ortega.  Guerrero told the CW

that if he located the co-conspirator, Guerrero would kill

him.

    The Government submits this incident is evidence

of the Solid Gold narcotics conspiracy, the participation

of Guerrero in that conspiracy, and demonstrates the

relationship of trust between Guerrero and other members of

Solid Gold, including the CW.

    It appears to be a statement by Guerrero

constituting an admission and is admissible.  Guerrero

seeks a hearing, however, as to the propriety of the

disclosure, which will be the subject of further

proceedings.

> **xx. Guerrero's Possession of Twenty Bundles of
> Crack Cocaine on February 24, 1994, To Be
> Offered Against Guerrero and Flores, Is
> Admissible**

28

The Government expects that CWs will testify about the February 24, 1994 murder of Santo Polanco ("Polanco"), a member of Solid Gold who was directly involved in the murder of Feliz. The night before Polanco was killed in a street dispute immediately outside one of Solid Gold's stash houses in Manhattan, several members of Solid Gold, including Guerrero and Flores, were in the stash house packaging crack cocaine for sale at the Boston Road drug spot. Polanco came to the stash house where he asked for, and was given, a gun. After the Solid Gold crew heard the gunshots from the street below, they feared that the police would come to the stash house to question them. As a result, Guerrero took twenty bundles of crack from the stash house to bring to Boston Road. When Guerrero reached the street, he saw that Polanco had been shot and brought him to the hospital.

The Government submits this incident is evidence of the existence of the Solid Gold drug conspiracy and Guerrero and Flores's membership in that conspiracy, and demonstrates the relationships of trust and closeness among Guerrero, Flores and other members of Solid Gold, including Polanco. It is admissible against Flores and Guerrero as evidence of the conspiracy and their participation.

### xxi. Guerrero's Possession of Gold-Top Crack Cocaine at 173rd Street and Boston Road on January 2, 1995, To Be Offered Against Guerrero, Is Admissible

The Government expects that an officer with the New York City Police Department who was acting in an undercover capacity will testify that he purchased crack cocaine from Guerrero and others on 173rd Street and Boston Road, Solid Gold's drug spot, on or about January 2, 1995. The crack was packaged in vials with gold-colored caps, consistent with the packaging used by Solid Gold for its crack cocaine. Numerous CWs will testify that nobody was permitted to sell crack cocaine, especially crack cocaine with gold-topped vials, at the Boston Road crack spot without the permission of the leaders of Solid Gold. CWs will testify that, as part of his compensation for the murders of Fernando Garrido and Ortega, Guerrero was permitted to sell Solid Gold's crack cocaine at the Boston Road spot during certain hours and to keep the profits for himself. CWs will testify that at some point after the 1994 homicides, Guerrero had a falling out with the leaders of Solid Gold because it was believed that Guerrero was selling his own crack cocaine, in gold-topped vials, at the Solid Gold Spot. As a result, Guerrero stopped working for

30

Solid Gold and opened his own drug spot at 174th Street and
Southern Boulevard, the location where Overman had sold
drugs before his murder.

The Government submits this evidence is direct
proof of the existence of the Solid Gold narcotics
conspiracy, the participation of Guerrero in that
conspiracy, and the end of Guerrero's involvement with that
crew in approximately 1995.

This evidence demonstrates Guerrero's
participation in the Solid Gold conspiracy and relevant
details about his departure from that crew and is
admissible against him.

### xxii. Guerrero's Possession of Cocaine and Crack Vials at Boston Road and 174th Street on October 20, 1995, To Be Offered Against Guerrero, Is Inadmissible

The Government expects that several CWs will
testify that in the Fall of 1995, Guerrero was arrested
near his drug spot inside a car with Mike, a former, long-
time member of Solid Gold, in the vicinity of 174th Street
and Boston Road. The arrest occurred after police were
informed by a police informant that Guerrero and other

31

members of his crew had tried to hire the informant to murder a drug dealer in the Bronx. Guerrero provided a gun to the informant. After receiving that information, police removed the firing pin from the gun, and monitored the informant's return to Guerrero drug spot. Police watched as the informant returned the gun to one of Guerrero's workers under the guise that he had not committed the murder because the gun had not worked. When the police approached, the worker threw the gun into a nearby lot. The police arrested Guerrero, but did not recover the gun. After the arrest, police recovered powder cocaine and 1,000 empty vials, which are typically used to package crack cocaine for retail sale. The testimony of law enforcement officers involved in the arrests, as well as vouchers demonstrating the seizure of the cocaine and vials upon the arrests of Guerrero and Mike, are proffered. A CW later recovered the gun and destroyed it.

The Government submits this evidence will corroborate testimony by the CWs about why Guerrero, a trusted member of Solid Gold, ceased involvement with that crew in approximately 1995 and was not involved in future criminal endeavors of Solid Gold about which several CWs will testify, complete the story surrounding the charged

32

homicides, and show that Guerrero had a close and trusting relationship with Mike, who was a core member of Solid Gold at the time of the murders of Fernando Garrido, Ortega, and Overman.

This evidence is duplicative of evidence that demonstrates Guerrero's close relationship with Mike, and evidence explaining Guerrero's departure from Solid Gold in 1995. Guerrero's arrest with 1,000 crack/cocaine vials is not relevant to the conspiracy. Its probative value is outweighed by its prejudice. It is inadmissible.

### xxiii. **Maldonado's Drug Dealing at the Boston Road Drug Spot After the Charged Murders, To Be Offered Against Maldonado, Is Admissible**

The Government intends to present evidence that a number of CWs, all of whom were members of Solid Gold and who worked at the Solid Gold drug spot on Boston Road, will testify that Maldonado continued to participate in Solid Gold's crack trade at Boston Road even after Diaz's murder.

The Government submits this evidence will demonstrate the continuation of Maldonado's participation in the conspiracy. It is admissible.

33

xxiv. **Flores's Drug Dealing At The Boston Road Drug Spot After The Charged Murders And On The Lower East Side Of Manhattan In 1997 And 1998, To Be Offered Against Flores, Is Admissible**

The Government expects that a number of CWs, all of whom were members of Solid Gold and who worked at the Solid Gold drug spot on Boston Road, will testify that Flores continued to participate in Solid Gold's crack trade at Boston Road even after Diaz's murder. Multiple CWs, all of whom were members of Solid Gold and who worked at the Solid Gold drug spot on Boston Road, will testify that they later established a drug spot with Flores and a CW in the vicinity of Avenue B and East 11th Street in Manhattan ("Lower East Side Drug Spot").

The Government submits this evidence will demonstrate the continued participation of Flores in the conspiracy.[4]

---

[4] The CWs and Flores were involved in planning and carrying out the murder of Pedro Medina, a rival drug dealer at the Lower East Side Drug Spot, in May of 1997. At the time, Medina owned the Lower East Side Drug Spot, and the murder, which is the subject of a separate pending indictment was commissioned by Flores and his co-conspirators so that they could take over and run the spot exclusively. The Government has indicated that it will not elicit Flores's involvement in the Medina murder at trial unless the defense opens the door to the introduction of such evidence. To the extent that counsel for defendants other than Flores seek to elicit information about these events, they may not do so in a way that may elicit statements which implicate Flores in the murder.

This evidence will be admitted against Flores.

## d. **The Admissibility of the Prison Records Cannot Be Decided on This Record**

The Government seeks an in limine determination
of the admissibility of "certain prison records related to
visits and phone calls that each of the trial defendants
received while serving time in prison," claiming that the
records "show direct communication between the trial
defendants and their co-conspirators . . . as well as other
individuals with knowledge of the charged murders.  These
records are important evidence to show the existence and
scope of the relationships among the various co-
conspirators, as well [as] the defendants' relationships
with the other individuals who were somehow related to the
charged murders and/or narcotics conspiracy."  Gov't Mots.
in limine at 38-39.

The Government has not yet specified which
records they intend to submit.  Maldonado, joined by
Flores, has pointed out that the proffered relationships
may not be contested by Defendants, in which case "there is
no need to prove it through the highly prejudicial means of
establishing that [Defendants were] in prison."  Maldonado

35

Opp'n at 7. It is not possible without further details of
the records that will be offered for admission to balance
their probative and prejudicial values and make a
determination of their admissibility.

### e. **The Government's Motion for a Protective Order is Granted**

The Government has requested that a protective
order be issued regarding the dissemination of material
produced pursuant to 18 U.S.C. § 3500. The Government
seeks an order requiring: (1) that the defense return or
destroy all 3500 material (including all copies thereof),
at the conclusion of the trial or when any appeal has
become final; (2) that the defense is preclude from
disseminating any 3500 material (and any copies) to anyone
beyond the defendants, defense counsel, and any paralegal
or staff employed by thee defense; and (3) the defendants
themselves are precluded from taking any 3500 material (or
any copies) that contains any reference to CWs or civilian
witnesses with them into any jail facility, or possessing
any 3500 material in any jail facility, either before,
during, or after trial; except that Defendants may review
3500 material in the possession of defense counsel when in
the presence of defense counsel. These requests are based

36

on the need to protect Government witnesses—both those incarcerated and those outside of prison—from threats, intimidation, retaliation, violence, or any other tampering by the defendants or other acting on their behalf. The Government draws on its experience of prosecuting violent crimes in asserting that 3500 material may be used by incarcerated defendants to harass, threaten, and retaliate against witnesses, both those in jail and those outside of prison. The risk of such measures increases when the 3500 material is in the possession of an inmate. Defendants lived in the same areas as the Government's witnesses; Defendants and some of these witnesses have known each other for years, and in some cases had close relationships with each other, and know members of their families.

Recognizing the need for protective action in cases where similar conduct is charged, judges in this District have granted motions by the Government along the lines proposed here, and have issued protective orders precluding defendants from taking 3500 material that discusses CWs and civilian witnesses into prison or keeping it with t hem in prison, or back to their home, as the case may be. See United States v. Elijah Bobby & Michael Williams, S1 00 Cr. 1008 (NRB) (racketeering, narcotics

conspiracy, murder); United States v. Sean Carr, S11 01 Cr. 490 (TPG) (racketeering, Hobbs Act robbery, murder); United States v. Rosalie Garcia, et al., S1 01 Cr. 1110 (GEL) (racketeering, narcotics conspiracy, murder); United States v. Darryl Henderson, S9 02 Cr. 451 (RO) (racketeering, narcotics conspiracy, murder); United States v. Lee & Williams, S2 02 Cr. 602 (AKH) (murder for hire); United States v. Martin Pedro, S3 03 Cr. 346 (SHS) (armed bank robbery, Hobbs Act robbery, weapons offenses), aff'd, United States v. Rivera, No. 04-CR-2999, 2005 WL 2323170 (2d Cir. Sept. 23, 2005); United States v. Nelson Martinez, et al., S30 04 Cr. 48 (JSR) (narcotics trafficking, weapons possession), aff'd, United States v. Moore, No. 07-CR-1589, 2009 WL 1033608 (2d Cir. Apr. 17, 2009); United States v. Cyril Smith, S2 05 Cr. 922 (DLC) (narcotics trafficking, multiple murders); United States v. Romeo Barnett, 05 Cr. 1007 (JFK) (narcotics conspiracy, weapons possession and discharge); United States v. Khalid Barnes, et al., S9 04 Cr. 186 (SCR) (narcotics trafficking and murders); United States v. Brandon Shaw, et al., 06 Cr. 41 (CM).

Defendants have objected to the request for a protective order based on the fact that it will be less time-efficient and make the preparation of defense more

38

costly.  In light of the balance of concerns for witness
safety against those of efficiency, the protective order
will issue.  Defense counsel will receive the 3500 material
a full two weeks before trial and the Government has agreed
to provide individual copies of the material to each
defendant's counsel in order to speed their review of it.

## IV.  CONCLUSION

For the reasons set forth above, the Government's
motions are granted in part and denied in part.  Guerrero's
motions are granted in part and denied in part.  Decision
is reserved pending further submissions on Maldonado's
motion and on the Government's motions articulated in its
April 6 letter.

It is so ordered.

New York, NY
April / 4/, 2010

ROBERT W. SWEET
U.S.D.J.

39